Aram Ordubegian (SBN 185142)
M. Douglas Flahaut (SBN 245558)
Christopher K.S. Wong (SBN 308048)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:    213.629.7400
Facsimile:    213.629.7401
Emails:    aram.ordubegian@arentfox.com
            douglas.flahaut@arentfox.com
            christopher.wong@arentfox.com

General Bankruptcy and Restructuring Counsel for
Debtor and Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:20-bk-10264-ER |
| **450 S. WESTERN, LLC, a California Limited Liability Company,** | Chapter 11 |
| Debtor and Debtor-in-Possession | **NOTICE OF FILING OF EXECUTED PURCHASE AND SALE AGREEMENT** |
| | _Proposed Sale Hearing and Auction_<br>Date:    October 14, 2020<br>Time:    10:00 a.m.<br>Place:    Courtroom 1568<br>            255 E. Temple St.,<br>            Los Angeles, CA 90012 |

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/22039771.1

1    TO    THE    HONORABLE    ERNEST    M.    ROBLES,    UNITED    STATES

2    BANKRUPTCY JUDGE; AND ALL INTERESTED PARTIES:

3        **PLEASE TAKE NOTICE THAT** attached as **Exhibit 1** hereto is a true and correct copy

4    of the Purchase and Sale Agreement executed on September 15, 2020 by and between the Debtor

5    and proposed Buyer Evergreen Capital Assets LP.  The Debtor anticipates filing a sale motion on

6    or before September 23, 2020 such that a sale hearing and auction can be held on October 14,

7    2020.

8    Dated:  September 15, 2020            **ARENT FOX LLP**

9

10

11                        By:    */s/ M. Douglas Flahaut*

12                            Aram Ordubegian
                            M. Douglas Flahaut
13                            Christopher K.S. Wong
                            General Bankruptcy and Restructuring Counsel
14                            for Debtor and Debtor-In-Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of the 15th day of September, 2020 (the "**Effective Date**"), by and between 450 S. Western, LLC, a California limited liability company, in its capacity as debtor-in-possession in the bankruptcy case, Case No. 2:20-bk-10264-ER ("**Debtor**") (in such capacity, "**Seller**") and Evergreen Capital Assets LP, or its assignee ("**Buyer**").

## R E C I T A L S

A.      Debtor has filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**").

B.      Seller owns the "Property" (as hereinafter defined) under Section 541 of the Bankruptcy Code, which Property consists of, among other things, an approximately three-story, 80,046 sq. ft. shopping center on approximately 1.67 acres located at 450 S. Western, Los Angeles, California, Assessor's Parcel Number 5503-014-020 and more particularly described on Exhibit "A".

C.      Seller believes a sale of the Property as provided herein is in the best interests of Seller and its creditors.

D.      Buyer desires to purchase the Property on the terms and conditions hereinafter documented.

E.      The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of a final, non-appealable Sale Order under Sections 363 and 365 of the Bankruptcy Code authorizing the sale of the Property by Seller to Buyer on the terms and conditions set forth herein.

F.      Seller and Buyer desire to consummate the proposed transaction on October 29, 2020; however, Buyer shall have the option to delay the closing to November 13, 2020 provided Buyer pays the additional interest on the secured claims between October 30, 2020 and November 13, 2020 on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto,

intending to be legally bound, do hereby agree as follows:

1.      Purchase and Sale.  Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Property on the terms and conditions hereinafter described without representation or warranty other than those expressly set forth herein.

1.1     Property.    As used herein, the "**Property**" means, collectively, the following but expressly excluding any Excluded Property:

1.1.1    That certain land described in Exhibit "A", together with all easements, rights-of-way, and appurtenances benefiting such land (the "**Land**");

1.1.2    All improvements, structures and fixtures now or on the "Closing Date" (as hereinafter defined) located upon the Land (the "**Improvements**");

1.1.3    Any air rights associated with the operation and maintenance of the Land and the Improvements;

1.1.4    All tangible personal property now or on the Closing Date located on the Land and Improvements other than the Excluded Property (the "**Personal Property**");

1.1.5    All outstanding accounts receivable and available cash collateral in the Seller's operating account;

1.1.6    Seller's interest in all leases expressly set forth at Exhibit "G" (the "**Leases**"), including without limitation all security deposits thereunder which have not been applied to unpaid rents, which shall be part of the "Leases;"

1.1.7    Seller's right, title and interest in all "Service Agreements" (as hereinafter defined) expressly set forth at Exhibit "I", governmental permits, entitlements, entitlement applications and licenses related to the Land, Improvements or Personal Property and other approvals, indemnification agreements from third parties to Seller, warranties and guarantees that Seller has received or applied for in connection with any work or services performed with respect to, or equipment installed in, the improvements on the Land; and

1.1.8    To the extent transferrable and subject to any waivers granted or settlements entered into by Seller prior to the Effective Date, any and all claims against present tenants of the Property and all rights, claims and causes of action Seller may have against third parties for negligence, gross negligence, willful misconduct or fraud in connection with the design

2

4

or construction of the Property.

1.1.9   For the avoidance of doubt, Buyer shall not assume any known or unknown liabilities of Seller in connection with the Property or otherwise, including but not limited to any claims that arose prior to Buyer's acquisition of Title that tenants may have against Seller. In addition, Buyer shall only assume those Leases, Service Agreements and any other executory contracts, if any, that are expressly set forth at <u>Exhibit "B"</u> (the "**Assumed Contracts**"), which Assumed Contracts shall be assumed and assigned by Buyer pursuant to Section 365 of the Bankruptcy Code.

1.2    <u>No Liens, Claims or Encumbrances.</u>  The sale, assignment, transfer and conveyance of the Property shall be made free and clear of all liens, claims (including successor liability claims), charges, security interests or other interests or encumbrances of any kind, nature or character, including without limitation all Seller liabilities.

1.3    <u>Excluded Property</u>.  Buyer acknowledges that certain fixtures and personal property shall not be conveyed to Buyer (collectively, the "**Excluded Property**"). Seller will provide Buyer with a good faith proposed list of the Excluded Property within two (2) days of the Effective Date. Buyer and Seller shall negotiate in good faith to finalize the list of Excluded Property prior to the date on which the sale hearing shall be held.  Such Excluded Property shall be expressly excluded from the Bill of Sale.

1.4    <u>Post-Closing Claims</u>.  Buyer acknowledges that any claims related to preferential transfer rights shall not be conveyed to Buyer. After the Closing Date, Buyer hereby agrees to cooperate with the reasonable request of Seller in connection with Seller's pursuit, litigation, and enforcement of such claims, including, to the extent necessary by virtue of Seller's ownership of the Property, making submittals and other court filings on Buyer's behalf, which submittals and other court filings shall be at the sole cost of Seller.

2.    <u>Purchase Price</u>.  The purchase price (the "**Purchase Price**") shall be Forty-Five Million Five Hundred and Ninety-one Thousand and No/100 Dollars ($45,591,000.00) payable as a cash deposit and a cash payment at closing as described below plus the allowable amount of the Buyer's secured claim subject to the terms of Section 8.8 below.  This payment has been adjusted to include an October payments by Seller of at least $75,000 to the secured creditors senior to Buyer.

<u>If the closing occurs after October 29, 2020, the Purchase Price will be increased dollar for dollar for all interest charges for all secured creditors that would otherwise have been paid</u>

3

<u>if the closing had occurred on or before October 29, 2020</u>.

3.    <u>Payment of Purchase Price</u>.  Buyer shall pay the Purchase Price to Seller as follows:

3.1    <u>Deposit</u>.

3.1.1    Within two (2) business days following the Effective Date, Buyer shall deposit the sum of One Million and No/100 Dollars ($1,000,000.00) (the "**Deposit**") into an escrow account with Chicago Title Insurance Company through its offices located at 3530 Wilshire Blvd. #1130, Los Angeles, CA 90010, Attention: Anna Ma and Jim Preston ("**Escrow Agent**") on terms and conditions acceptable to Buyer and Seller (the "**Escrow**").  The Deposit shall be held by Escrow Agent as a deposit against the Purchase Price in accordance with the terms and provisions of this Agreement.  At all times that the Deposit is being held by the Escrow Agent, the Deposit shall be invested by Escrow Agent in an interest bearing account, earning interest at readily available, market rates, as directed or approved by Buyer.  The Escrow Agent shall only dispose of the Deposit as provided in this Agreement.  Subject to <u>Section 10.2</u>, in the event that the sale of the Property does not occur for any reason other than default by the Buyer, then the entire amount of the Deposit, plus any and all interest earned on the Deposit, shall be returned to Buyer.

3.1.2    The following provisions shall control with respect to the rights, duties and liabilities of Escrow Agent.

(a)    Escrow Agent acts hereunder as a depository only and is not responsible or liable in any manner whatsoever for the (i) sufficiency, correctness, genuineness or validity of any written instrument, notice or evidence of a party's receipt of any instruction or notice which is received by Escrow Agent, or (ii) identity or authority of any person executing such instruction notice or evidence.

(b)    Escrow Agent shall have no responsibility hereunder except for the performance by it in good faith of the acts to be performed by it hereunder, and Escrow Agent shall have no liability except for its own willful misconduct or gross negligence.

(c)    Escrow Agent shall be reimbursed on an equal basis by Buyer and Seller for any reasonable expenses incurred by Escrow Agent arising from a dispute with respect to the amount held in escrow, including the cost of any legal expenses and

court costs incurred by Escrow Agent, should Escrow Agent deem it necessary to retain an attorney with respect to the disposition of the amount held in escrow.

(d)    In the event of a dispute between the parties hereto with respect to the disposition of the amount held in escrow, Escrow Agent shall be entitled, at its own discretion, to deliver such amount to an appropriate court of law pending resolution of the dispute.

3.2    Initial Payment.  The Purchase Price, as adjusted by the application of the Deposit and by the prorations and credits specified herein, shall be paid to Escrow Agent by wire transfer of immediately available funds (through the escrow described in Section 5) on the Closing Date (the amount to be paid under this Section 3.2 being herein called the "**Closing Payment**").

4.    Conditions Precedent.  The obligation of Buyer to purchase, and Seller to sell, the Property as contemplated by this Agreement is subject to satisfaction of each of the following respective conditions precedent (any of which may be waived in writing by the party in whose favor such condition exists) on or before the applicable date specified for satisfaction of the applicable condition (or, if no date is specified, the Closing Date).  If any of such conditions is not fulfilled (or so waived) pursuant to the terms of this Agreement, then the party in whose favor such condition exists may terminate this Agreement and, in connection with any such termination made in accordance with this Section 4, Seller and Buyer shall be released from further obligation or liability hereunder (except for those obligations and liabilities which, pursuant to the terms of this Agreement, expressly survive such termination), and the Deposit shall be disposed of in accordance with Section 10.

4.1    Title Matters.

4.1.1    Title Report.  Buyer shall obtain within two (2) business days of the Effective Date a preliminary title report ("**Preliminary Title Report**") covering the Property prepared by Chicago Title Insurance Company (in its capacity as title company, the "**Title Company**").  Seller will provide Buyer with a copy of the existing survey.  Buyer will immediately upon receipt of Seller's survey order an update of Seller's survey  (the "**Survey**").  Buyer shall deliver to Seller a copy of each of the Preliminary Title Report and the Survey promptly following Buyer's receipt of each. It is unlikely that Buyer will receive the Survey prior to the close of the Feasibility Period.  Due to the anticipated delay in receiving the Survey, Buyer shall have until two (2) business days after receipt of the Survey to approve the Survey.  If Buyer shall fail to deliver the "Buyer's Election Notice" (defined below) on or before the end of the Feasibility

5

Period, then Buyer shall only be deemed to have approved all exceptions to title shown on the Preliminary Title Report and with respect to the Preliminary Title Report such matters shall be deemed to be Permitted Exceptions. If Buyer does not approve the Survey within the time limit described above then Buyer shall be deemed to have approved all exceptions to title shown on the Survey and such matters shall also be deemed to be Permitted Exceptions. If any exceptions to title or survey matters that were not Permitted Exceptions, were not described in the Preliminary Title Report, and were not revealed by the Survey are disclosed after the end of the periods described above, whether as a result of an update to the Preliminary Title Report, Survey, or otherwise, then Buyer shall provide Seller with notice of such exceptions to title or survey matters no later than five (5) days after Buyer obtains knowledge of the same.  Seller may elect, in its sole discretion, to either cure some or all of such exceptions or matters or to decline to take any action with respect to some or all of any such exceptions or matters by providing written notice of such election to Buyer.  If Seller declines to take any action with respect to some or all of any such exceptions or matters, then Buyer's sole remedy shall be to either (i) terminate this Agreement within five (5) days following its receipt of Seller's election notice, in which event this Agreement shall terminate, the Deposit shall be returned to Buyer, and the parties shall have no further rights or obligations under this Agreement except those that expressly survive termination of this Agreement, or (ii) waive such exceptions or matters and proceed to Closing in accordance with the terms of this Agreement.  Notwithstanding the foregoing provisions of this <u>Section 4.1.1</u>, Seller shall be obligated to cause the release at Closing of or cause the Title Insurance Company to insure over at Closing any "**Seller Encumbrances**" (which, as used herein, means the lien securing any loan existing as of the date hereof and encumbering the Property, and any monetary liens, lis pendens and judgment liens which encumber the Land or the Improvements, but which expressly excludes any declarations, covenants, easements, or restrictions encumbering the Property).  Seller may elect to effectuate such release concurrent with the Closing using a portion of the Purchase Price.

        4.1.2    <u>Title Contingency</u>.  A condition precedent to Buyer's obligation to purchase the Property shall be the irrevocable and unconditional commitment of Title Company, subject to Buyer's compliance with the terms of this Agreement, to issue to Buyer effective as of the date and time the Deed is recorded, an extended coverage ALTA owner's form title policy ("**Owner's Policy**"), or equivalent form acceptable to Buyer, with (subject to Buyer's payment of the fees and premiums for the issuance of such endorsements in accordance with <u>Section 5.2</u>), with coverage in the amount of the Purchase Price and dated as of the date and time of recordation of the Deed, indicating title to the Land (including any easements described herein for the benefit of the Property) and Improvements to be vested of record in Buyer, subject solely to the "Permitted

6

Exceptions" (as defined below).  As used herein:

"**Permitted Exceptions**" means the following:  (1) the lien of any real estate taxes and assessments for the "Current Tax Year" (as defined below) and subsequent periods, to the extent not yet payable, provided that the same are prorated in accordance with this Agreement; (2) such other matters and exceptions set forth in the Preliminary Title Report or Survey which are approved or deemed approved by Buyer during the Feasibility Period pursuant to the terms of this Agreement; and (3) any matters and exceptions not set forth in the Survey or the Preliminary Title Report, but which are approved or deemed waived by Buyer pursuant to Section 4.1.1.

"**Title Endorsements**" means the endorsements included in any title commitment or proforma or specimen policy issued by the Title Company and shall include, without limitation, the following endorsements, provided they are available in the State of California:  (a) access (CLTA 103.7 or local equivalent); and (b) separate tax parcel (CLTA 129.1, 129, or a local equivalent of either).

4.2     Feasibility Period.  Except as otherwise provided herein, Buyer shall have until 5:00 p.m. (prevailing Pacific Time) on September 23, 2020 or such earlier date as may be agreed upon by the parties (the period beginning on the date hereof and ending on such date being herein called the "**Feasibility Period**") within which to perform and complete all of Buyer's examinations, reviews and inspections of all matters pertaining to the Property, including, without limitation, all leases and service contracts, all physical, environmental and compliance matters and conditions respecting the Property (including, without limitation, all zoning and entitlement aspects of the Property), copies of Seller's insurance policies and copies of Seller's monthly operating reports filed with the Bankruptcy Court for the Property (together, the "**Property Documents**").  Seller will deliver to Buyer copies of the following documents to the extent they are in Seller's possession: (i) any plans and specifications for all Improvements on the Property; (ii) all unexpired warranties and guarantees which Seller has received in connection with any work or services performed with respect to, or equipment installed in, the improvements on the Property; (iii) all material, non-privileged documents of Seller relating to the Property, (iv) all Leases, all material correspondence to or from any tenants and all other files or materials relating to the Leases; ; and (v) all Service Agreements that will remain in effect after the Closing and all correspondence and records relating to the on-going operations (including tenant billings) and maintenance of the Property and such other  originals or copies of the Property Documents that are within Seller's possession or control.  Seller shall obtain and deliver to Buyer no later than 5:00 p.m. on September 21, 2020 the following documents:  estoppel certificates executed by the tenants in the form attached hereto as Exhibit K and copies of notices given to all Tenants whose

security deposits were applied to past due rent  advising those Tenants that their respective past due rent has been reduced by their security deposits.  Additionally, Seller shall provide Buyer with reasonable access to the Property and its files relating to the Property upon reasonable advance notice and shall use reasonable efforts (at no additional cost or expense to Seller) to promptly provide all other information reasonably requested by Buyer relating to the operation of the Property that is within Seller's possession or control.

4.2.1    Review Standards.  Buyer shall at all times conduct its reviews, inspections and examinations in a manner so as to not cause any greater than *de minimis* liability, damage, loss, cost or expense to Seller or the Property (other than that arising from the discovery of preexisting conditions) and so as to not unreasonably interfere with or disturb any tenant at the Property, and Buyer will indemnify, defend, and hold Seller and the Property harmless from and against any such liability, damage, loss, cost or expense to the extent caused by Buyer's review, inspections or examinations of the Property (provided, however, that any such claim for damages shall exclude any or all indirect, consequential or punitive damages or lost profits of Seller) (the foregoing obligation surviving any termination of this Agreement), to the extent not arising from any preexisting condition, and specifically excluding any matters relating to the mere discovery of existing conditions.  Buyer may (a) contact any tenant or service provider of the Property; (b) contact any governmental authority having jurisdiction over the Property; and (c) perform any structural or environmental testing of the Property; provided that without the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed), in no event shall Buyer make any intrusive environmental or structural testing at the Property (such as soil borings, water samplings or the like) other than that which may be required in connection with the preparation of a Phase I environmental assessment of the Property (the "**Buyer Phase I**").  Seller will provide Buyer with a copy of the Seller's Phase I Environmental Site report dated July 10, 2020 **(the "Seller Phase I"),** Seller hereby consents to Buyer conducting the Buyer Phase I and Seller hereby consents to Buyer contacting the preparer of Seller's Phase I Environmental Site Report to discuss the content thereof; and Buyer hereby agrees to supply to Seller the report prepared for the Buyer's Phase I  and any final reports produced in connection with any other invasive testing or asbestos testing, all within five (5) business days following Buyer's receipt thereof; provided, however, that if a final report has not been issued prior to the expiration of the Feasibility Period, Buyer will supply to Seller the most recent draft report in its possession within one (1) business day of the expiration of the Feasibility Period.  The Buyer Phase I Report and the Seller Phase I Report and any other reports produced in connection with foregoing shall be provided to Buyer and Seller subject to the condition that neither Buyer nor Seller nor any potential bidder may (y) rely on the information contained in such reports or (z) make a claim of reliance on such reports. In the event

8

of any termination hereunder (other than by reason of Seller's default), at Seller's written request, Buyer shall return or destroy all documents and other materials furnished by Seller hereunder. Promptly upon the completion of any physical inspection of the Property, Buyer shall at its sole cost and expense cause any portion of the Property damaged or altered by or in connection with such inspection to be repaired and/or restored to substantially the condition it was in prior to the inspection.  Any inspections undertaken by or on behalf of Buyer pursuant to this <u>Section 4</u> shall be at Buyer's sole risk and the cost and expense of the inspections and tests undertaken pursuant to this <u>Section 4</u> shall be borne solely by Buyer.

4.2.2    <u>Termination Right</u>.    Buyer may determine, on or before the expiration of the Feasibility Period, based upon its review, examination or inspection of the Property, whether or not to acquire the Property for any reason or for no reason at all.  Buyer shall notify Seller in writing prior to the expiration of the Feasibility Period if Buyer has elected  to acquire the Property or not to acquire the Property (such notice being herein called the "**Buyer's Election Notice**").  If Buyer elects to terminate this Agreement in Buyer's Election Notice, this Agreement, and the obligations of the parties hereunder shall terminate (other than those obligations that expressly survive a termination of this Agreement).

4.2.3    <u>Conduct of Inspections</u>.    Buyer, at all times, will conduct all inspections and reviews in compliance with all Legal Requirements, and in a manner so as to not cause damage, loss, cost or expense to Seller or the Property.  Other than required under the Legal Requirements, subpoena or other court order, Buyer shall not reveal to any governmental agency or any other third party (other than Buyer's employees, agents, attorneys, lenders and advisors) not approved by Seller the results of or any other information acquired pursuant to its inspections. "**Legal Requirement**" shall mean any applicable federal, state, local or municipal constitution, law, ordinance, rule, order, regulation or statute of any governmental authority bearing on the construction, alteration, rehabilitation, maintenance, use, operation, sale, transfer or any other aspect of all or any portion of the Property.

4.2.4    <u>Confidentiality</u>.    Buyer covenants and agrees that, until the Closing Date, all information and materials disclosed and/or delivered to it by Seller, or Seller's agents, employees and representatives (including without limitation, the Property Documents), are confidential and proprietary information and shall not be disclosed except in accordance with <u>Section 11.23</u> below.  Buyer also agrees that, in the event the transactions contemplated in this Agreement are not consummated as provided herein, Buyer shall promptly return to Seller or notify Seller in writing that Buyer has destroyed all such information and documentation, and all copies thereof, together with copies of all third party reports and studies obtained by Buyer with respect

9

to the Property that were not previously provided to Seller pursuant to <u>Section 4.2.1</u> above, with any information confidential or proprietary to Buyer redacted.

   4.2.5 <u>No Representations or Warranties</u>.  Except as expressly provided herein, Seller makes no representations or warranties as to the truth, accuracy or completeness of any materials, data or other information, if any, supplied to Buyer in connection with Buyer's inspection of the Property (e.g., that such materials are complete, accurate or the final version thereof, or that all such materials are in Seller's possession).  Except for Buyer's reliance on any representation and warranties expressly provided herein, it is the parties' express understanding and agreement that any such materials are to be provided only for Buyer's convenience in making its own examination and determination as to whether it wishes to purchase the Property, and, in doing so, Buyer shall rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on any materials supplied by Seller.  Except for Buyer's reliance on any representation and warranties expressly provided herein with respect to any such materials, Buyer expressly disclaims any intent to rely on any such materials provided to it by Seller in connection with its inspection and agrees that it shall rely solely on its own independently developed or verified information.

   4.2.6 <u>Survival</u>.  The obligations and agreements of Buyer under this <u>Section 4.2</u> (including its indemnification obligations) shall survive Closing or the termination of this Agreement.

   4.3 <u>Sale Order</u>.  As a condition precedent to Buyer's obligation to acquire the Property, the Bankruptcy Court shall have entered a sale order  (the "**Sale Order**"), and the Sale Order shall have become final and non-appealable, including that the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil Procedure) or a petition for writ of certiorari with respect to the Sale Order must have expired and no such appeal, motion, or petition is pending.

   4.4 <u>Material Adverse Change</u>.  As a condition precedent to Buyer's obligation to acquire the Property, there shall not have been any adverse change in the physical condition of the Property from the Effective Date to the Closing Date.

   4.5 <u>Performance by Seller</u>.  The performance and observance, in all material respects, by Seller of all covenants and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date shall be a condition precedent to Buyer's obligation to purchase the Property.  Without limitation on the foregoing, in the event that the "Seller Closing

Certificate" (as hereinafter defined) shall disclose any material adverse changes in the representations and warranties of Seller contained in this Agreement or any certificate delivered by Seller in connection herewith which are not otherwise permitted or contemplated by the terms of this Agreement, then Buyer shall have the right to terminate this Agreement, in which case the Deposit shall be returned to Buyer.

4.6    Performance by Buyer.  The performance and observance, in all material respects, by Buyer of all covenants and agreements of this Agreement to be performed or observed by them prior to or on the Closing Date shall be a condition precedent to Seller's obligation to sell the Property.  Without limitation on the foregoing, in the event that the "Buyer Closing Certificate" (as hereinafter defined) shall disclose any material adverse changes in the representations and warranties of Buyer contained in this Agreement or any certificate delivered by Buyer in connection herewith which are not permitted or contemplated by the terms of this Agreement, then Seller shall have the right to terminate this Agreement and the Liquidated Damages Amount shall be delivered to Seller as liquidated damages.

4.7    Condition of the Property.  THE FOLLOWING PROVISIONS IN THIS SECTION 4.7 ARE SUBJECT TO THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 7 OF THIS AGREEMENT:

(a)    BY ENTERING INTO THIS AGREEMENT, BUYER HAS AGREED TO, AND WILL, PERFORM (AND BUYER REPRESENTS AND WARRANTS TO SELLER THAT BUYER IS CAPABLE OF PERFORMING) AN INDEPENDENT INVESTIGATION, ANALYSIS AND EVALUATION OF THE PROPERTY.

(b)    BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS SUBSTANTIAL EXPERIENCE WITH REAL PROPERTY, AND THAT BUYER WILL ACQUIRE THE PROPERTY IN "AS IS, WHERE IS, WITH ALL FAULTS" CONDITION, AND SOLELY IN RELIANCE ON BUYER'S OWN INSPECTION AND EXAMINATION AND SELLER'S REPRESENTATIONS AND WARRANTIES EXPRESSLY CONTAINED HEREIN.

(c)    EXCEPT AS TO THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT SELLER MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND, NATURE OR SORT, EXPRESS OR IMPLIED, WITH RESPECT TO THE PHYSICAL CONDITION, PAST, PRESENT

11

OR FUTURE OPERATION AND/OR PERFORMANCE, OR VALUE, OF THE PROPERTY AND THAT SELLER CONVEYS THE PROPERTY TO BUYER "<u>AS IS AND WHERE IS, WITH ALL FAULTS</u>," AND BUYER ACKNOWLEDGES THAT SELLER MAKES NO REPRESENTATIONS, GUARANTIES OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, AS TO THE QUALITY, CHARACTER, EXTENT, PERFORMANCE, CONDITION OR SUITABILITY OF THE PROPERTY FOR ANY PURPOSE.

(d)    BUYER'S INSPECTION, INVESTIGATION AND SURVEY OF THE PROPERTY SHALL BE IN LIEU OF ANY NOTICE OR DISCLOSURE REQUIRED BY ANY APPLICABLE HEALTH AND SAFETY CODE, OR BY ANY OTHER PROVISION OF APPLICABLE LAW, RULE OR REGULATION, INCLUDING, WITHOUT LIMITATION, LAWS REQUIRING DISCLOSURE BY SELLER OF FLOOD, FIRE, MOLD, SEISMIC HAZARDS, LEAD PAINT, LANDSLIDE AND LIQUEFACTION, OTHER GEOLOGICAL HAZARDS, RAILROAD AND OTHER UTILITY ACCESS, SOIL CONDITIONS AND OTHER CONDITIONS WHICH MAY AFFECT THE USE OF THE PROPERTY, AND BUYER HEREBY WAIVES ANY REQUIREMENT FOR A NOTICE PURSUANT TO THOSE PROVISIONS AND HEREBY ACKNOWLEDGES AND AGREES THAT IT WILL CONDUCT ITS OWN INSPECTIONS AND REVIEWS WITH RESPECT TO ALL MATTERS COVERED THEREBY, AND HEREBY RELEASES SELLER FROM LIABILITY IN CONNECTION WITH ANY SUCH MATTERS THAT ARE NOT THE SUBJECT OF SELLER'S REPRESENTATIONS AND WARRANTIES.

(e)    BUYER ALSO ACKNOWLEDGES AND AGREES THAT, ALTHOUGH SELLER HAS PROVIDED TO BUYER THE PROPERTY DOCUMENTS AND OTHER DOCUMENTS AND RECORDS, SELLER HAS NOT VERIFIED THE ACCURACY THEREOF AND MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE MATTERS SET FORTH THEREIN EXCEPT AS MAY BE EXPRESSLY SET FORTH HEREIN, IT BEING THE RESPONSIBILITY OF BUYER TO VERIFY THE ACCURACY OF SUCH MATERIALS.

(f)    FURTHERMORE, EXCEPT AS TO THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER ACKNOWLEDGES THAT SELLER HAS NOT AND DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES IN CONNECTION WITH THE PRESENCE OR INTEGRATION OF HAZARDOUS MATERIALS UPON OR WITHIN THE

PROPERTY.  IN THAT REGARD, BUYER WILL, PRIOR TO THE EXPIRATION OF THE FEASIBILITY  PERIOD, CONDUCT ITS OWN INVESTIGATIONS TO DETERMINE IF THE PROPERTY CONTAINS ANY HAZARDOUS MATERIALS OR TOXIC WASTE, MATERIALS, DISCHARGE, DUMPING OR CONTAMINATION, WHETHER SOIL, GROUNDWATER OR OTHERWISE, WHICH VIOLATES ANY FEDERAL, STATE, LOCAL OR OTHER GOVERNMENTAL LAW, REGULATION OR ORDER OR REQUIRES REPORTING TO ANY GOVERNMENTAL AUTHORITY.

(g)    EXCEPT AS TO THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER, FOR ITSELF AND ITS OWNERS, SUCCESSORS AND ASSIGNS, HEREBY RELEASES AND FOREVER DISCHARGES SELLER, AND ITS PAST, PRESENT AND FUTURE MEMBERS, PARTNERS, AFFILIATES, EMPLOYEES, AGENTS, ATTORNEYS, ASSIGNS, AND SUCCESSORS-IN-INTEREST FROM ALL PAST, PRESENT AND FUTURE CLAIMS, DEMANDS, OBLIGATIONS, LOSSES AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, WHETHER NOW KNOWN OR UNKNOWN, DIRECT OR INDIRECT, FORESEEN OR UNFORESEEN, SUSPECTED OR UNSUSPECTED, WHICH ARE BASED UPON OR ARISE OUT OF OR IN CONNECTION WITH THE CONDITION OF THE PROPERTY AND, WITH RESPECT TO THE PRESENCE OF ANY HAZARDOUS MATERIALS, ANY ENVIRONMENTAL DAMAGES OR ENVIRONMENTAL REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, THE PHYSICAL, STRUCTURAL, GEOLOGICAL, MECHANICAL AND ENVIRONMENTAL (SURFACE AND SUBSURFACE) CONDITION OF THE PROPERTY OR ANY LAW OR REGULATION RELATING TO HAZARDOUS MATERIALS.  WITHOUT LIMITING THE FOREGOING, THIS RELEASE SPECIFICALLY APPLIES TO ALL LOSSES AND CLAIMS ARISING UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986, (42 U.S.C. SECTIONS 9601 ET SEQ.), THE RESOURCES CONSERVATION AND RECOVERY ACT OF 1976, (42 U.S.C. SECTIONS 6901 ET SEQ.), THE CLEAN WATER ACT, (33 U.S.C. SECTIONS 466 ET SEQ.), THE SAFE DRINKING WATER ACT, (14 U.S.C. SECTION 1401-1450), THE HAZARDOUS MATERIALS TRANSPORTATION ACT, (49 U.S.C. SECTIONS 1801 ET SEQ.), THE TOXIC SUBSTANCE CONTROL ACT, (15 U.S.C. SECTIONS 2601-2629), AND ANY OTHER FEDERAL, STATE OR LOCAL LAW OF SIMILAR

13

EFFECT, AS WELL AS ANY AND ALL COMMON LAW CLAIMS.

BY INITIALING THIS CLAUSE BELOW, BUYER ACKNOWLEDGES THAT THIS SECTION HAS BEEN READ AND FULLY UNDERSTOOD, AND THAT BUYER HAS HAD THE CHANCE TO ASK QUESTIONS OF ITS COUNSEL ABOUT ITS MEANING AND SIGNIFICANCE.

---

**BUYER'S INITIALS**

(i)    "**Environmental Damages**" means all claims, judgments, damages, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs, and expenses of investigation and defense of any claim, whether or not such claim is ultimately defeated, and of any good faith settlement of judgment, of whatever kind or nature, contingent or otherwise matured or unmatured, foreseeable or unforeseeable, including without limitation reasonable attorneys' fees and disbursements and consultants' fees, any of which are incurred at any time as a result of the existence of Hazardous Materials upon, about or beneath the Property or migrating to or from the Property, or the existence of a violation of Environmental Requirements pertaining to the Property, regardless of whether the existence of such Hazardous Materials or the violation of Environmental Requirements arose prior to the present ownership or operation of the Property.

(j)    "**Environmental Requirements**" means all applicable present and future statutes, regulations, rules, ordinances, codes, licenses, permits, orders, approvals, plans, authorizations, concessions, franchises, and similar items, of all governmental agencies, departments, commissions, boards, bureaus, or instrumentalities of the United States, states and political subdivisions thereof and all applicable judicial, administrative, and regulatory decrees, judgments, and orders relating to Hazardous Materials or the protection of human health or the environment.

(k)    "**Hazardous Materials**" means any substance (i) the presence of which requires investigation or remediation under any federal, state or local statute, regulation, ordinance or policy; or (ii) which is defined as a "**hazardous waste**" or "**hazardous substance**" under any federal, state or local statute, regulation or ordinance, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.) and the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.) and amendments thereto and regulations promulgated

14

thereunder; or (iii) which is toxic, explosive, corrosive, infectious or otherwise hazardous or is regulated by any federal, state or local governmental authority; or (iv) without limitation which contains polychlorinated biphenyls (PCBs), asbestos or urea formaldehyde.

The provisions of this <u>Section 4.7</u> shall survive Closing.

     5.    <u>Closing Procedure</u>.  The sale and purchase herein provided shall be consummated (the "**Closing**") at a closing conference, which shall be held on the Closing Date held through Escrow.  Provided all closing conditions set forth in Section 4 have been satisfied or waived, the Closing shall take place on or before October 29, 2020. Buyer shall have the option, in its sole discretion, to Close prior to October 29, 2020 if it provides Seller with not less than five (5)  days written notice of the new Closing Date.  If Buyer exercises its option to close prior to October 29, 2020 and provided Seller with the required notice, the purchase price shall be adjusted down to account for the decrease in interest on secured claims.  Buyer shall also have  an option, in its sole discretion, to delay the closing to a date on or before November 13, 2020 provided Buyer pays the additional interest on the secured claims between October 30, 2020 and November 13, 2020 or such earlier date on which the transaction may close (the "Closing Date") on the terms and conditions set forth herein.

     5.1    <u>Escrow</u>.  Except as otherwise specifically indicated herein, at least one (1) business day prior to the Closing Date, Seller and Buyer shall deliver to Escrow Agent the items set forth in <u>Section 5.1.1</u> and <u>Section 5.1.2</u>.  Such delivery shall be made pursuant to separate escrow instructions ("**Escrow Instructions**") to be delivered by each of Buyer and Seller to Escrow Agent.  The conditions to the closing of such escrow shall include the Escrow Agent's receipt of the Closing Payment and a notice from each of Buyer and Seller authorizing Escrow Agent to close the transactions as contemplated herein (each of Buyer and Seller being obligated to deliver such authorization notice on the Closing Date as soon as it is reasonably satisfied that the other party is in a position to deliver the items to be delivered by such other party herein).

     5.1.1    <u>Seller Deliveries</u>.  At least one (1) business day prior to the Closing Date, Seller shall deliver to Buyer through Escrow the following:

     (a)    One (1) original of a duly executed and acknowledged original grant deed (the "**Deed**") in the form of <u>Exhibit "C"</u>;

     (b)    Two (2) originals of a duly executed bill of sale and ("**Bill of Sale**") from Seller with respect to the Personal Property and Intangible Property included

15

in the Property in the form of <u>Exhibit "D"</u>;

   (c) Two (2) originals of a duly executed certificate of Seller (the "**Seller Closing Certificate**") in the form of <u>Exhibit "E"</u> representing to Buyer that the representations and warranties of Seller contained in this Agreement are true and correct as of the Closing Date in all material respects;

   (d) An affidavit pursuant to Section l445(b)(2) of the Code, and on which Buyer is entitled to rely, that Seller is not a "foreign person" within the meaning of Section l445(f)(3) of the Code.  If Seller fails to provide such form on or before the Closing Date, Seller agrees that the Escrow Agent shall be authorized and instructed to withhold the amount required by the Foreign Investment in Real Property Tax Act at Closing from that portion of the Purchase Price that would otherwise be disbursed to Seller and to disburse that amount to the Internal Revenue Service in accordance with that act;

   (e) Evidence reasonably satisfactory to Title Company respecting the due organization of Seller and the due authorization and execution of this Agreement and the documents required to be delivered hereunder;

   (f) To the extent they are then in Seller's possession or control, and have not heretofore been delivered to Buyer:  (i) any plans and specifications for all Improvements on the Property; (ii) all unexpired warranties and guarantees which Seller has received in connection with any work or services performed with respect to, or equipment installed in, the improvements on the Property; (iii) all keys for all improvements on the Property; (iv) all material, non-privileged documents of Seller relating to the Property, (v) originals of all Leases, all material correspondence to or from any tenants and all other files or materials relating to the Leases; and (vi) originals of all Service Agreements that will remain in effect after the Closing and all correspondence and records relating to the on-going operations (including tenant billings) and maintenance of the Property (which materials under this clause (f) may be either delivered at Closing or left at the management office at the Property);

   (g) One (1) certified copy of the Sale Order; and

   (h) Such additional documents as may be reasonably required by Buyer and Title Company in order to consummate the transactions hereunder (provided the same do not increase in any material respect the costs to, or liability or obligations of, Seller in a manner not otherwise provided for herein).

16

5.1.2   <u>Buyer Deliveries</u>.   At least one (1) day prior to the Closing Date, unless otherwise indicated, Buyer shall deliver to Seller through Escrow the following:

(a)   On the Closing Date, the Closing Payment, by wire transfer in immediately available federal funds;

(b)   Two (2) counterpart originals of a duly executed and acknowledged Bill of Sale;

(c)   Two (2) originals of a certificate of Buyer (the "**Buyer Closing Certificate**") in the form of <u>Exhibit "F"</u> representing to Seller that the representations and warranties of Buyer contained in this Agreement are true and correct as of the Closing Date;

(d)   Evidence reasonably satisfactory to Title Company respecting the due organization of Buyer and the due authorization and execution of this Agreement and the documents required to be delivered hereunder;

(e)   Such additional documents as may be reasonably required by Seller and Title Company in or to consummate the transactions hereunder (provided the same do not increase in any material respect the costs to, or liability or obligations of, Buyer in a manner not otherwise provided for herein).

5.2   <u>Closing Costs</u>.   Seller shall pay (i) 100% of all state, county and city transfer taxes and fees payable, if any, in connection with the transfer contemplated herein, (ii) 100% of all excise and sales taxes, (iii) 100% of all recording charges for the Deed and the Bill of Sale, to the extent recorded, (iv) 100% of any lien payment or debt prepayment penalties in connection with the release of any Seller Encumbrances, (v) 100% of Seller's legal fees, (vi) the title insurance premium for the CLTA title insurance policy, (vii) any fees or compensation due CBRE, Inc. ("**Seller's Broker**") with brokers fees to be limited to $50,000 if there are no overbids, (viii) 50% of all escrow charges; (ix) 100% of U.S. Trustee's Fees related to the sale; and (ix) 100% of any other customary closing costs typically paid by Seller (collectively the "**Seller's Closing Costs**"). Buyer shall pay (i) 100% of its own review costs and third party property inspection fees, including the cost of any additional environmental, asbestos and physical audits Buyer deems necessary, (ii) 100% of Buyer's legal fees, (iii) 50% of all escrow charges, (iv) the costs of ALTA extended coverage and any endorsements to the Owner's Policy; and (v) 100% of the costs of the Survey. Any other closing costs shall be allocated in accordance with local custom.  Seller and Buyer shall pay their respective shares of prorations as hereinafter provided.

5.3    Prorations.

5.3.1    Items to be Prorated.  Subject to Section 5.3.2 below, the following shall be prorated between Seller and Buyer as of 11:59 p.m. prevailing Pacific Time on the day prior to the Closing Date (on the basis of the actual number of days elapsed over the applicable period).  Except as expressly provided to the contrary in this Section 5.3, all items of revenue, cost and expense of the Property, with respect to the period prior to 11:59 p.m. on the day prior to the Closing Date, shall be for the account of Seller and all items of revenue, cost and expense of the Property, with respect to the period after 11:59 p.m. on the day prior to the Closing Date, shall be for the account of Buyer.

(a)    All real estate taxes and assessments on the Property and any and all personal property and excise taxes for the tax year (the "**Current Tax Year**") in which the Closing occurs.  Seller shall be responsible for all real property taxes, personal property taxes, regardless of when payable and when billed, impositions and other assessments that are attributable to the period prior to the Closing Date, and Buyer shall be responsible for all real property taxes, personal property taxes, regardless of when payable and when billed, impositions and other assessments that are attributable to the period from and after the Closing Date.  If the real property tax rate, personal property tax rate or any assessment has not been set for the fiscal year in which the Closing occurs, then the proration of such real property tax, personal property tax or assessment shall be based upon the rate or assessment for the preceding fiscal year for such tax or assessment which has not been set for the fiscal year in which the Closing occurs, and such proration shall be adjusted between Seller and Buyer upon presentation of written evidence that the actual taxes or assessment paid (determined as of the date such taxes or assessment are actually paid) for the fiscal year in which the Closing occurs differ from the amounts used at Closing and in accordance with the provisions of Section 5.3.3.

(b)    Rents that are delinquent (or payable but unpaid) as of the Closing Date shall not be prorated on the Closing Date. Seller agrees to turn over to Buyer the rights to all unpaid rents for current tenants. Seller will apply tenant security deposits toward unpaid rents (due to the COVID-19 shutdowns) prior to the Closing Date. Seller shall leave with Buyer, or provide a credit in an amount equal to, all prepaid rentals for periods after the Closing Date and all refundable security deposits (to the extent the foregoing were made by tenants under the Leases and are not applied or forfeited prior to the Closing Date) to Buyer on the Closing Date in the amounts listed at EXHIBIT B. However, with respect to delinquent rents and any other amounts or other rights of any

18

kind respecting tenants who are no longer tenants of the Property as of the Closing Date, Seller shall retain all rights relating thereto.  Notwithstanding anything set forth above, the Seller shall reject and shall not assign to Buyer all contracts and leases  relating to the Property, other than leases or contracts, if any, identified as being assumed and assigned on Exhibit "B".

(c)     All fees due under any Service Agreements that are not being terminated as of the Closing Date.

5.3.2   Items Not Prorated.  Seller shall  use commercially reasonable efforts to cause meters for utilities at the Property, including telephone, electricity, water and gas, to be read on the Closing Date, and Buyer shall be responsible for all actions needed to arrange for utilities to be transferred to the name of Buyer on the Closing Date, including the posting of any required deposits.  In the event a meter reading is unavailable for any particular utility, such utility shall be prorated in the manner provided in Section 5.3.3 below.

5.3.3   Calculation.  The prorations and payments shall be made on the basis of a written statement submitted to Buyer and Seller by Escrow Agent prior to the Close of Escrow and approved by Buyer and Seller.  Any item which cannot be finally prorated because of the unavailability of information shall be tentatively prorated on the basis of the best data then available and reprorated when the information is available.   In the event any prorations or apportionments made under this Section 5.3.3 shall prove to be incorrect for any reason, then any party shall be entitled to an adjustment to correct the same provided a written request identifying the error in reasonable detail is given to the other party no later than 12 months after the Closing.

6.     Condemnation or Destruction of Property.  In the event that, after the date hereof but prior to the Closing Date, either any portion of the Property is taken pursuant to eminent domain proceedings or any of the Improvements on the Property are damaged or destroyed by any casualty, which would be a material adverse change while Seller shall not have any obligation to repair or replace any such damage or destruction,  Seller shall be required to give Buyer prompt written notice of the same.  If  Buyer elects to proceed with this transaction pursuant to Section 4.4, in addition to delivering title Seller shall deliver and assign to Buyer, upon consummation of the transaction herein provided (except to the extent any condemnation proceeds or insurance proceeds are attributable to lost rents or other items applicable to any period prior to the Closing), all claims of Seller respecting any condemnation or casualty insurance coverage, as applicable, and all condemnation proceeds or proceeds from any such casualty insurance received by Seller on account of any casualty (except to the extent required for costs of repairs by Seller prior to the

19

Closing Date), as applicable.

      7.     <u>Representations and Warranties</u>.

      7.1     <u>Representations and Warranties of Seller</u>.  Seller hereby represents and warrants to Buyer as of the Effective Date and as of the Closing Date the following, to Seller's knowledge:

      7.1.1     <u>Litigation</u>.  Except as otherwise described in <u>Exhibit "H"</u>, there is no pending (and Seller has not received any written notice of any threatened) action, litigation, condemnation or other proceeding (collectively, "**Proceeding**") involving any portion of the Property or against Seller and Seller is not aware of any Proceeding involving any portion of the Property that has previously been settled or otherwise concluded.  Seller has no knowledge of any proposed or pending zone changes, contemplated condemnation or existing or contemplated assessment affecting any portion of the Property.

      7.1.2     <u>Compliance</u>.  Seller has received no written notice from any governmental authority having jurisdiction over the Property or any insurance carrier of Seller to the effect that the Property is not in compliance with any applicable codes, laws, statutes, ordinances, regulations, rules, covenants, conditions or restrictions.

      7.1.3     <u>Agreements and Contracts</u>.  Except as otherwise described in <u>Exhibit "I"</u>, there are no service agreements, equipment leasing contracts or other contracts or agreements relating to the Property (including, without limitation, contracts or agreements which may affect the ownership, management, maintenance, operation, development, construction or financing of the Property) currently in effect or which will be in force after the Closing, except for the Leases, the Service Agreements and the Permitted Encumbrances.  As used herein, the "**Service Agreements**" means, collectively, (i) contracts described in <u>Exhibit "I"</u>, and (ii) contracts entered into in accordance with this Agreement.  Neither Seller nor any party to the Service Agreements is in monetary default or material non-monetary default under the Service Agreements.  The leases described in <u>Exhibit "H"</u> are the only agreements in force and effect relating to the occupancy of the Property.

      7.1.4     <u>Due Authority</u>.  This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Seller is and on the Closing Date will be duly authorized, executed and delivered by and are binding upon Seller.  Seller has the capacity and authority to enter into this Agreement and consummate the transactions herein provided without the consent or joinder of any other party.

7.1.5    <u>Consents; No Conflict</u>.    Other than the Sale Order, Seller has obtained all consents and permissions related to the transactions herein contemplated and required under any covenant, agreement, encumbrance, or applicable laws.  Neither this Agreement nor any agreement or certificate executed by Seller, nor anything provided in or contemplated by this Agreement or any such other agreement or certificate, does now or shall hereafter breach, violate, invalidate, cancel, make inoperative or interfere with, or result in the acceleration or maturity of, any agreement, document, instrument, right or interest, judgment, order, injunction, decree, law, regulation or ruling of any court or other governmental authority affecting or relating to Seller or the Property.

7.1.6    <u>Environmental Matters</u>.  Except as set forth in the reports described in <u>Exhibit "J"</u> (the "**Environmental Reports**"), there is (and has been) no Hazardous Materials at, upon or adjacent to the Property.

7.1.7    <u>Designation of Easements</u>.  There exist no unrecorded agreements that obligate Seller or any of its successors in title or any other party to grant an easement or any other right of way to any party for any designated areas at the Property.

7.1.8    <u>ERISA</u>.  Neither (i) any assets of Seller, nor (ii) any funds to be used by Seller with respect to the transactions contemplated pursuant to this Agreement, are, or at Closing will be, pursuant to ERISA or the Code considered for any purpose of ERISA or Section 4975 of the Code to be assets of a Plan.  Seller is not executing this Agreement and will not be performing its obligations or exercising its rights or remedies under the Agreement on behalf of or for the benefit of any Plan.  Neither the execution or delivery of this Agreement by Seller, nor the performance by Seller of its obligations or the exercise of its rights or remedies under this Agreement, nor any transaction contemplated under this Agreement, is or will be a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code.  For the purposes hereof the following terms shall have the following meanings:  "**Code**" shall mean the Internal Revenue Code of 1986, as amended; "**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended (and any successor statute and any applicable regulations or guidance promulgated thereunder); and "**Plan**" shall mean a "plan" as that term is defined in Section 3(3) of ERISA or Section 4975 of the Code.

7.1.9    <u>OFAC</u>.  Seller is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986 and the regulations promulgated thereunder.  Neither Seller nor any of its affiliates, is (A) conducting any business or engaging in any transaction or dealing with any person appearing on the U.S. Treasury Department's OFAC

list of prohibited countries, territories, "specifically designated nationals" or "blocked person" (each a "Prohibited Person") (which lists can be accessed at the following web address: http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (B) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (C) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (D) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or I engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (1) any U.S. anti-money laundering law, (2) the Foreign Corrupt Practices Act, (3) the U.S. mail and wire fraud statutes, (4) the Travel Act, (5) any similar or successor statutes or (6) any regulations promulgated under the foregoing statutes.

7.1.10 <u>Property Documents</u>.  Prior to the Effective Date, Seller delivered or otherwise made available to Buyer all Property Documents that are within Seller's possession or control at no additional cost or expense to Seller.  To Seller's knowledge, the Property Documents are not materially false or misleading.

7.1.11 Physical Condition of the Property.  Seller has no knowledge of any adverse physical condition existing on the Property that would impact the operation and/or performance, or value of the Property.  To the extent that Seller becomes aware of such condition Seller will disclose such information to Buyer.

7.2    <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller the following:

7.2.1    <u>Due Authority</u>.  This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Buyer are and on the Closing Date will be duly authorized, executed and delivered by and are binding upon Buyer. Buyer is Evergreen Capital Assets LP, a limited partnership, duly organized and validly existing and in good standing under the laws of the State of California, and Buyer is duly authorized and qualified to do all things required of it under this Agreement.  Buyer has the capacity and authority to enter into this Agreement and consummate the transactions herein provided without the consent

or joinder of any other party (except as otherwise may be set forth in this Agreement).

              7.2.2   <u>Consents; No Conflict</u>.  Other than the Sale Order, Buyer has obtained all consents and permissions related to the transactions herein contemplated and required under any covenant, agreement, encumbrance, or applicable laws.  Neither this Agreement nor any agreement or certificate executed by Buyer under <u>Section 5.1.2</u>, nor anything provided in or contemplated by this Agreement or any such other agreement or certificate, does now or, to Buyer's knowledge, shall hereafter breach, violate, invalidate, cancel, make inoperative or interfere with, or result in the acceleration or maturity of, any agreement, document, instrument, right or interest, judgment, order, injunction, decree, law, regulation or ruling of any court or other governmental authority affecting or relating to Buyer.

              7.2.3   <u>OFAC</u>.  Buyer is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986 and the regulations promulgated thereunder.  Neither Buyer nor any of its affiliates, is (A) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (B) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (C) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (D) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or I engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (1) any U.S. anti-money laundering law, (2) the Foreign Corrupt Practices Act, (3) the U.S. mail and wire fraud statutes, (4) the Travel Act, (5) any similar or successor statutes or (6) any regulations promulgated under the foregoing statutes.

              7.3   <u>No Survival</u>.  It is the intention of the parties that the representations and warranties set forth in this <u>Section 7</u> shall not survive Closing and shall merge into the Deed.

              7.4   <u>Knowledge</u>.  When a statement is made under this Agreement to the "**knowledge**" of Seller (or other similar phrase), it means only the present actual knowledge of the Debtor, without any duty of inquiry, any imputation of the knowledge of another, or independent investigation of the relevant matter by any individual(s), and without any personal liability.

23

Notwithstanding any provision of this Agreement to the contrary, should any of the foregoing representations and warranties of Seller become false or inaccurate prior to the Closing Date through no breach by Seller of its covenants hereunder, and provided Seller discloses the same to Buyer, in writing, prior to the Closing Date, then Buyer's sole recourse shall be to either (i) terminate this Agreement and cancel the Escrow, in which case the Deposit shall be returned to Buyer and neither Seller nor Buyer will have any further liability or obligation under this Agreement (except for those obligations which survive in accordance with their terms), or (ii) proceed with the Closing, without reservation, in which case Buyer shall be deemed to have waived all claims against Seller with respect to such false or inaccurate representation and warranty.

      8.    <u>Interim Covenants</u>.  Until the Closing Date or the sooner termination of this Agreement:

      8.1    <u>Maintenance and Operation</u>.  Seller shall maintain the Property in the same manner as prior hereto (such maintenance obligations not including capital expenditures or expenditures not currently being incurred in Seller's ordinary maintenance of the Property), subject to reasonable wear and tear and further subject to destruction by casualty or other events beyond the reasonable control of Seller.  Without limitation of the foregoing, Seller shall maintain its current or comparable insurance.

      8.2    <u>Service Agreements</u>.  From the Effective Date until the expiration of the Feasibility Period, Seller shall not enter into any additional service contracts or other similar agreements relating to the Property or material modifications to the Service Agreements without the prior written consent of Buyer, which consent will not be unreasonably withheld.  Following the expiration of the Feasibility Period, Seller shall not enter into any additional service contracts or other similar agreements relating to the Property or material modifications to the Service Agreements without the prior written consent of Buyer, which may be granted or withheld in Buyer's sole and absolute discretion.

      8.3    <u>Leases</u>.  From the Effective Date until the expiration of the Feasibility Period, Seller shall not terminate, modify, extend, renew, amend, replace or otherwise change any of the Leases or existing contracts or enter into new leases or contracts without the prior written consent of Buyer, which consent will not be unreasonably withheld.  Following the expiration of the Feasibility Period, provided that this Agreement has not been terminated, Seller shall not enter into any new leases or material modifications of existing Leases or such new leases without Buyer's prior written consent, which may be granted or withheld in Buyer's sole and absolute discretion.

24

8.4     Access to the Property.  Seller shall give Buyer access to the Property in accordance with and subject to the provisions of Section 4.2.

8.5     Mortgages.  Seller shall not encumber the Property with any mortgages or deeds of trust or other encumbrances other than those that encumber the Property as of the Effective Date.

8.6     Bankruptcy Court Filings and Approval.

8.6.1    Seller shall use all reasonable efforts to cause the Bankruptcy Court to enter the Sale Order as soon as possible after October 15, 2020, which Sale Order shall approve a sale to the successful buyer approved by the Bankruptcy Court.

8.6.2    Buyer agrees that it will use commercially reasonable efforts to promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer under each executory contract to be assumed and assigned to Buyer.

8.6.3    Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Bankruptcy Court approval and that the sale is subject to overbid.  Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest, best or otherwise financially superior offer possible for the Property.

8.6.4    Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all persons entitled thereto, of all motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

8.6.5    In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of either of such orders.  Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

8.6.6    After entry of the Sale Order, to the extent Buyer is the successful

25

bidder at the Auction, Seller shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

8.7 <u>Break-Up Fee</u>.

8.7.1 If this Agreement is terminated after the Effective Date pursuant to <u>Section 9.1.1</u>; Buyer is not in material breach of this Agreement at the time of such termination; and the Property is sold to a third party then Seller shall pay in cash to Buyer a break-up fee in the amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Break-Up Fee**") by wire transfer of immediately available funds to the account specified by Buyer to Seller in writing within five (5) business days following closing of the Alternative Transaction.

8.7.2 Seller agrees and acknowledges that Buyer's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal and other resources by Buyer and its Affiliates and that such due diligence, efforts, negotiation and execution have provided value to Seller. The provision of the Break-Up Fee is an integral part of this Agreement, without which Buyer would not have entered into this Agreement. Seller's obligation to pay the Break-Up Fee shall survive the termination of this Agreement.

8.8 <u>Buyer's Carve Out for the Benefit of General Unsecured Creditors</u>.

8.8.1 Buyer agrees that if the Property is sold pursuant to the terms of this Agreement or to a third party at auction at the sale hearing contemplated by this Agreement, and if Buyer receives a payment on account of its secured claim from the sale proceeds, Buyer will, immediately upon the close of escrow, carve out and transfer the payment received up to Five Hundred Thousand and 0/100 Dollars ($500,000.00). For the avoidance of doubt, if Buyer receives $500,000 or more from the sale proceeds, Buyer will transfer $500,000 to Seller. If Buyer receives $300,000 or any other sum less than $500,000 from the sale proceeds, Buyer will transfer $300,000 or the amount received that is less than $500,000 to Seller (the "Carve Out"). Buyer will not be required under any circumstance to contribute new money in addition to the Purchase Price to fund the Carve Out. Seller will hold the amount transferred by Buyer in a segregated account controlled by Richard Laski or a chapter 7 trustee in the event of a conversion to chapter 7 in trust for the sole and exclusive benefit of the bankruptcy estate in the Chapter 11 Case and not subject to any secured claims (the "**Carve Out**"). Buyer and Seller herein agree that the Carve Out shall be deemed

26

unencumbered estate property and distributed pursuant to the priorities set forth in the Bankruptcy Code. This stipulated carve out of funds shall be binding on the Debtor's successor(s)-in-interest (including but not limited to any chapter 7 trustee) in the event of a conversion to chapter 7 or a dismissal of the chapter 11 Case. In the event of a dismissal of the chapter 11 case and there is no distribution to unsecured creditors the Carve Out amount shall be returned to Buyer. Buyer's ability to credit bid the amount of its secured claim at any auction conducted in connection with this sale shall be reduced by the Carve Out. In the event the proceeds of the sale of the Property are such that, after satisfaction of all allowed secured claims and Seller's Closing Costs (with brokers fees to be limited to $50,000 if there are no overbids), there is a surplus remaining for the bankruptcy estate, then Buyer shall be reimbursed from such surplus up to a maximum amount of the Carve Out. In this manner, Buyer's obligations to carve out a recovery for the estate shall be reduced on a dollar for dollar basis for every dollar of cash received by the bankruptcy estate from the sale, after satisfaction of all allowed secured claims; U.S. Trustee's Fees related to the sale; and Seller's Closing Costs (with brokers fees to be limited to $50,000 if there are no overbids).

8.8.2 Notwithstanding anything to the contrary in 8.8.1, if there is an overbid of at least $50,000,000 and the allowed secured claims are $47,000,000 or less, the Buyer shall be entitled to a full reimbursement of the Carve Out.

8.8.3 Provided the Property is sold to a third party at auction at the sale hearing contemplated by this Agreement for an amount equal to or greater than $50,000,000, the provisions set forth above in 8.8.1 and 8.8.2 shall survive the termination of this Agreement.

9. Termination.

9.1 Termination Events. Notwithstanding anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

9.1.1 By Buyer if:

(a) Buyer is not the winning bidder at the sale; or

(b) Seller enters into or consummates a transaction other than that contemplated by this Agreement (an "**Alternative Transaction**"); or

(c) Seller breaches any of its representations, warranties or covenants set forth in this Agreement in any material respect or fails to effectuate the

Closing when required under this Agreement; or

(d)    The Court approves a minimum overbid for the Property of less than $50,000,000.

9.1.2    By either Seller or Buyer if:

(a)    the Closing does not occur on or prior to October 29, 2020 (or November 13, 2020 if Buyer exercises its option), other than as a result of a material breach by the terminating party, as applicable, of any covenant or agreement contained herein;

(b)    any of the conditions to Closing shall have become incapable of fulfillment other than as a result of a breach by Buyer (if Buyer is the party electing to terminate) or Seller (if Seller is the party electing to terminate), as applicable, of any covenant or agreement contained herein; or

(c)    there shall be in effect a final order of a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the Closing.

10.    **DISPOSITION OF DEPOSIT**.

10.1    **IF THE TRANSACTION HEREIN PROVIDED SHALL NOT BE CLOSED BY REASON OF SELLER'S DEFAULT UNDER THIS AGREEMENT OR THE FAILURE OF SATISFACTION OF THE CONDITIONS BENEFITING BUYER UNDER SECTION 4 OR THE TERMINATION OF THIS AGREEMENT IN ACCORDANCE WITH SECTION 9, THEN THE DEPOSIT SHALL BE RETURNED TO BUYER, AND NO PARTY SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER (EXCEPT UNDER THOSE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE TERMINATION OF THIS AGREEMENT); PROVIDED, HOWEVER, IF THE TRANSACTION HEREUNDER SHALL FAIL TO CLOSE SOLELY DUE TO THE DEFAULT OF SELLER, THEN BUYER, AS ITS SOLE AND EXECLUSIVE REMEDY, SHALL BE ENTITLED TERMINATE THIS AGREEMENT AND OBTAIN A RETURN OF THE DEPOSIT,  BUT NO OTHER ACTION, FOR DAMAGES OR OTHERWISE, SHALL BE PERMITTED.**

10.2    **IN THE EVENT THE TRANSACTION HEREIN PROVIDED**

28

**SHALL NOT CLOSE SOLEY DUE TO THE DEFAULT OF BUYER, BUT IF AND ONLY IF THE SALE ORDER IS ENTERED BY THE BANKRUTPCY COURT, THEN THE DEPOSIT (THE "LIQUIDATED DAMAGES AMOUNT") SHALL BE DELIVERED TO SELLER AS FULL COMPENSATION AND LIQUIDATED DAMAGES UNDER AND IN CONNECTION WITH THIS AGREEMENT, AND IN SUCH EVENT, BUYER SHALL NOT BE LIABLE TO SELLER FOR MONETARY DAMAGES EXCEPT FOR FORFEITURE OF THE LIQUIDATED DAMAGES AMOUNT (AND AS PROVIDED UNDER THOSE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE TERMINATION OF THIS AGREEMENT) AND THE PARTIES SHALL TAKE SUCH ACTION AS MAY BE REQUIRED TO CAUSE THE DEPOSIT TO BE DELIVERED TO SELLER. IN CONNECTION WITH THE FOREGOING, THE PARTIES RECOGNIZE THAT SELLER WILL INCUR EXPESES IN CONNECTION WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN THE EXTENT OR DETRIMENT TO SELLER CAUSED BY THE BREACH BY BUYER UNDER THIS AGREEMENT OR THE AMOUNT OF COMPENSATION SELLER SHOULD RECEIVE AS A RESULT OF BUYER'S BREACH OR DEFAULT.**

_____          _____
**Seller's Initials**                                     **Buyer's Initials**

11.    <u>Miscellaneous</u>.

11.1    <u>Financing</u>.  Buyer is not dependent on any third party financing for the Purchase Price.

11.2    <u>Brokers</u>.  Seller has agreed to pay a brokerage commission to Seller's Broker if the Property is sold for an amount equal or greater than fifty million ($50,000,000.00) pursuant to a separate agreement between Seller and Seller's Broker, which Seller shall be exclusively responsible for and shall indemnify, defend and hold harmless Buyer from the same.

11.3    <u>Bidding Procedures</u>.  The parties agree that the Seller will propose a minimum overbid of $50,000,000 subject to approval of the Bankruptcy Court.  Seller will consult with Buyer on reasonable bidding procedures for an auction which shall conform as closely as possible with Judge Robles' posted procedures including but not limited to defining the requirements to determine qualified bidders, which procedures shall be subject to Bankruptcy Court approval.  Seller will provide Buyer with a draft of the proposed bidding procedures no later

29

**SHALL NOT CLOSE SOLEY DUE TO THE DEFAULT OF BUYER, BUT IF AND ONLY IF THE SALE ORDER IS ENTERED BY THE BANKRUTPCY COURT, THEN THE DEPOSIT (THE "LIQUIDATED DAMAGES AMOUNT") SHALL BE DELIVERED TO SELLER AS FULL COMPENSATION AND LIQUIDATED DAMAGES UNDER AND IN CONNECTION WITH THIS AGREEMENT, AND IN SUCH EVENT, BUYER SHALL NOT BE LIABLE TO SELLER FOR MONETARY DAMAGES EXCEPT FOR FORFEITURE OF THE LIQUIDATED DAMAGES AMOUNT (AND AS PROVIDED UNDER THOSE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE TERMINATION OF THIS AGREEMENT) AND THE PARTIES SHALL TAKE SUCH ACTION AS MAY BE REQUIRED TO CAUSE THE DEPOSIT TO BE DELIVERED TO SELLER.  IN CONNECTION WITH THE FOREGOING, THE PARTIES RECOGNIZE THAT SELLER WILL INCUR EXPESES IN CONNECTION WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN THE EXTENT OR DETRIMENT TO SELLER CAUSED BY THE BREACH BY BUYER UNDER THIS AGREEMENT OR THE AMOUNT OF COMPENSATION SELLER SHOULD RECEIVE AS A RESULT OF BUYER'S BREACH OR DEFAULT.**

_____          _____

**Seller's Initials**                          **Buyer's Initials**

11.    Miscellaneous.

11.1    Financing.  Buyer is not dependent on any third party financing for the Purchase Price.

11.2    Brokers.  Seller has agreed to pay a brokerage commission to Seller's Broker if the Property is sold for an amount equal or greater than fifty million ($50,000,000.00) pursuant to a separate agreement between Seller and Seller's Broker, which Seller shall be exclusively responsible for and shall indemnify, defend and hold harmless Buyer from the same.

11.3    Bidding Procedures.  The parties agree that the Seller will propose a minimum overbid of $50,000,000 subject to approval of the Bankruptcy Court.  Seller will consult with Buyer on reasonable bidding procedures for an auction which shall conform as closely as possible with Judge Robles' posted procedures including but not limited to defining the requirements to determine qualified bidders, which procedures shall be subject to Bankruptcy Court approval.  Seller will provide Buyer with a draft of the proposed bidding procedures no later

29

32

than 5:00 p.m. on September 21, 2020.

        11.4    <u>Survival</u>.  Except as otherwise expressly provided herein, none of the warranties, representations, covenants, obligations, agreements and indemnifications contained in this Agreement shall survive the Closing and shall be merged with the Deed.  By proceeding with the closing of the sale transaction, Seller and Buyer shall be deemed to have waived, and so covenant to waive, any claims of defaults or breaches by the other party existing on or as of the Closing Date whether under this Agreement or any other document or instrument executed by the other party in connection with this transaction, of which the waiving party was made aware by notice from the defaulting or breaching party (and, if applicable, which is described on Seller's certification of representations and warranties to be delivered at Closing) prior to the Closing Date for which the other party shall have no liability.

        11.5    <u>Further Instruments</u>.  Each party will, whenever and as often as it shall be requested so to do by the other, cause to be executed, acknowledged or delivered any and all such further instruments and documents as may be necessary or proper, in the reasonable opinion of the requesting party, in order to carry out the intent and purpose of this Agreement.

        11.6    <u>Cumulative Remedies</u>.  Except as otherwise set forth herein, no remedy conferred upon a party in this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute (except as otherwise expressly herein provided).

        11.7    <u>No Waiver</u>.  No waiver by a party of any breach of this Agreement or of any warranty or representation hereunder by the other party shall be deemed to be a waiver of any other breach by such other party (whether preceding or succeeding and whether or not of the same or similar nature), and no acceptance of payment or performance by a party after any breach by the other party shall be deemed to be a waiver of any breach of this Agreement or of any representation or warranty hereunder by such other party, whether or not the first party knows of such breach at the time it accepts such payment or performance.  No failure or delay by a party to exercise any right it may have by reason of the default of the other party shall operate as a waiver of default or modification of this Agreement or shall prevent the exercise of any right by the first party while the other party continues to be so in default.

        11.8    <u>Consents and Approvals</u>.  Except as otherwise expressly provided herein, any approval or consent provided to be given by a party hereunder must be in writing to be effective

and may be given or withheld in the absolute discretion of such party.

11.9    <u>Press Releases</u>.  Any press release issued with respect to the transactions contemplated by this Agreement shall be subject to the prior approval of Buyer and Seller, which consent shall not be unreasonably withheld.

11.10    <u>Modification</u>.  This Agreement may not be modified or amended except by written agreement signed by all parties.

11.11    <u>Incorporation of Exhibits</u>.    All exhibits attached and referred to in this Agreement are hereby incorporated herein as fully set forth in (and shall be deemed to be a part of) this Agreement.

11.12    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements between the parties hereto respecting such matters.  Seller and Buyer each expressly disclaim any reliance on any oral or written representations, warranties, comments, statements or assurances made by Seller, Buyer, and any of their respective affiliates, and their respective agents, employees, representatives, attorneys or brokers, as an inducement or otherwise, to Buyer's and Seller's respective execution hereof.

11.13    <u>Non-Business Days</u>.  Whenever action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or by a particular date) that ends (or occurs) on a non-business day, then such period (or date) shall be extended until the immediately following business day.  As used herein, "business day" means any day other than a Saturday, Sunday or federal or California state holiday.

11.14    <u>Severability</u>.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

11.15    <u>Interpretation</u>.  Words used in the singular shall include the plural, and vice-versa, and any gender shall be deemed to include the other.  Whenever the words "including", "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner.  The captions and headings of the Sections of this Agreement are for convenience of

31

34

reference only, and shall not be deemed to define or limit the provisions hereof.  Except as otherwise indicated, all Exhibit and Section references in this Agreement shall be deemed to refer to the Exhibits and Sections in this Agreement.  Each party acknowledges and agrees that this Agreement (a) has been reviewed by it and its counsel, (b) is the product of negotiations between the parties, and (c) shall not be deemed prepared or drafted by any one party.  In the event of any dispute between the parties concerning this Agreement, the parties agree that any ambiguity in the language of the Agreement is to not to be resolved against Seller or Buyer, but shall be given a reasonable interpretation in accordance with the plain meaning of the terms of this Agreement and the intent of the parties as manifested hereby.

11.16   <u>Governing Law</u>.  This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of California shall govern (without regard to conflicts of law).  The Bankruptcy Court shall retain exclusive jurisdiction to enforce the provisions of this Agreement.

11.17   <u>Third Party Beneficiaries</u>.  Except as otherwise expressly provided in this Agreement, Seller and Buyer do not intend by any provision of this Agreement to confer any right, remedy or benefit upon any third party, and no third party shall be entitled to enforce or otherwise shall acquire any right, remedy or benefit by reason of any provision of this Agreement.

11.18   <u>No Recordation</u>.  In no event shall this Agreement or any document or memorandum related to the subject matter of this Agreement be recorded without the prior written consent of Seller and except as herein provided.

11.19   <u>Effectiveness of Agreement</u>.  In no event shall any draft of this Agreement create any obligations or liabilities, it being intended that only a fully executed and delivered copy of this Agreement will bind the parties hereto.

11.20   <u>No Joint Venture</u>.  This Agreement does not and shall not be construed to create a partnership, joint venture or any other relationship between the parties hereto except the relationship of the seller and buyer specifically established hereby.

11.21   <u>Successors and Assigns</u>.  Buyer may assign this Agreement (in whole or in part) and any document executed in connection herewith and its rights and obligations hereunder to a new entity or multiple new entities by delivery of written notice of such assignment to Seller, provided that such assignee(s) expressly assume(s) the obligations of Buyer.  Upon any such assignment by Buyer and acceptance by such assignee(s) of all rights and obligations under this Agreement and such other document(s), Buyer shall be relieved from liability under this

Agreement and such other document(s).

11.22   <u>Notices</u>.   Any notice which a party is required or may desire to give the other party shall be in writing and may be delivered (1) personally, (2) by United States registered or certified mail, postage prepaid, (3) by Federal Express or other reputable courier service regularly providing evidence of delivery (with charges paid by the party sending the notice); or (4) by facsimile, provided that such facsimile shall be immediately followed by delivery of such notice pursuant to clause (1), (2) or (3) above.   Any such notice shall be addressed as follows (subject to the right of a party to designate a different address for itself by notice similarly given):

<u>To Buyer</u>:
Evergreen Capital Assets LP
3919 Beverly Blvd, #202
Los Angeles, CA 90004
Attention:      Richard Kim

<u>With Copy To</u>:
Krafchak & Lynch
567 W Channel Islands Blvd, Suite 332
Port Hueneme, California  93041
Attention:      Stephanie  L. Krafchak

<u>To Seller</u>:
Richard J. Laski, Chief Restructuring Officer
c/o Wilshire Partners of CA, LLC
470 Maylin St.
Pasadena, CA  91105

<u>With Copy To</u>:
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, California 90013
Attention:      Aram Ordubegian

<u>To Title Company or Escrow</u>:
Chicago Title Insurance Company
3530 Wilshire Blvd. #1130

33

Los Angeles, CA 90010

Attention:    Anna Ma and Jim Preston

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be.  Any such notice not so given shall be deemed given upon actual receipt of the same by the party to whom the same is to be given.  The attorneys for any party hereto shall be entitled to provide any notice that a party desires to give or is required to give hereunder.

11.23  Legal Costs.  The parties hereto agree that they shall pay directly any and all legal costs, which they have incurred on their own behalf in the preparation of this Agreement, all other agreements pertaining to this transaction, and that such legal costs shall not be part of the closing costs.  In addition, if any party hereto brings any suit or other proceeding with respect to the subject matter or the enforcement of this Agreement, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced), in addition to such other relief as may be awarded, shall be entitled to recover reasonable attorneys' fees, expenses and costs of investigation actually incurred from the non-prevailing party.  The foregoing includes attorneys' fees, expenses and costs of investigation (including those incurred in appellate proceedings), costs incurred in establishing the right to indemnification, or in any action or participation in, or in connection with, any case or proceeding under Chapter 7, 11 or 13 of the Bankruptcy Code (11 United States Code Sections 101 et seq.), or any successor statutes.  This Section shall survive any termination of this Agreement.

11.24  Confidentiality.  Prior to the entry of the Sale Order, the information delivered by Seller or discovered by Buyer and its agents in connection with its investigation of the Property shall remain confidential and shall not be disclosed by either party hereto without the written consent of the other except (1) to such party's directors, officers, partners, members, employees, legal counsel, accountants, prospective lenders, engineers, architects, financial advisors and similar professionals and consultants to the extent such party deems it necessary or appropriate in connection with the transaction contemplated hereunder (and such party shall inform each of the foregoing parties of such party's obligations under this Paragraph, provided however, that such parties shall have no liability on account of any failure by any such representatives and agents to keep such information confidential); (2) as otherwise required by law or regulation; or (3) to the extent data becomes available to such parties from any other source (other than by reason of a breach by such party of the confidentiality restrictions herein).  Each party shall indemnify, defend and hold the other party harmless from and against any Claims

34

37

arising from a breach by it of this Section 11.23.  The restrictions in this Paragraph shall survive a termination of this Agreement but shall terminate as to Buyer only upon the purchase of the Property by Buyer.

11.25   Time of the Essence.  Time is of the essence as to this Agreement and each and every obligation hereunder.

11.26   Limitation of Liability.  No present or future direct or indirect partner, member, manager, director, officer, shareholder, employee, advisor, affiliate or agent of Buyer or any affiliate of such parties shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Seller, on its behalf and on behalf of its successors and assigns, shall look solely to the Buyer for the payment of any claim or for any performance, and Seller hereby waives any and all such personal liability.  For purposes of this Section 11.26, no negative capital account or any contribution or payment obligation of any partner or member in Buyer shall constitute an asset of Buyer.  The limitations of liability contained herein are in addition to, and not in limitation of, any limitation on liability applicable to Buyer provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument.   Any provision providing that it survives the Closing will survive Closing without limitation unless a specified period is otherwise provided in this Agreement.  All other representations, warranties, covenants and agreements made or undertaken by Seller under this Agreement, unless otherwise specifically provided herein, will not survive the Closing Date but will be merged into the Deed and other Closing documents delivered at the Closing.

11.27   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

11.28   IRS – Form 1099-S.  For purposes of complying with Section 6045 of the Internal Revenue Code of 1986, as amended, Escrow Agent shall be deemed the "person responsible for closing the transaction" and shall be responsible for obtaining the information necessary to file with the Internal Revenue Service Form 1099-S, "Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions."

11.29   **WAIVER OF JURY TRIAL.    THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY**

**CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

[REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURES PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

**450 S. Western, LLC,**
a California limited liability company

By: _____

    Name: Richard J. Laski

    Title:  Chief Restructuring Officer

**BUYER:**

**EVERGREEN CAPITAL ASSETS LP,**
a California limited partnership

By: _____

    Name: Richard Kim

    Title: Authorized Signatory

37

40

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

**450 S. Western, LLC**,
a California limited liability company

By: _____

      Name: Richard J. Laski
      Title:  Chief Restructuring Officer

**BUYER:**

**EVERGREEN CAPITAL ASSETS LP,**
a California limited partnership

By: _____

      Name: Richard Kim
      Title: Authorized Signatory

37

41

## EXHIBIT LIST

"A"   -   Description of Land

"B"   -   Assumed Contracts

"C"   -   Form of Deed

"D"   -   Form of Bill of Sale

"E"   -   Form of Seller's Closing Certificate

"F"   -   Form of Buyer's Closing Certificate

"G"   -   Leases

"H"   -   Litigation

"I"   -   Service Agreements

"J"   -   Environmental Reports

"K"   -   Estoppel Certificate

## EXHIBIT "A" - DESCRIPTION OF LAND

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

> LOTS 1, 2, 3, 4, 37, 38, 39, 40 AND THE SOUTH 10 FEET OF LOT 36 OF TRACT 1624, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 21, PAGE(S) 58 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

> APN: 5503-014-020.

**EXHIBIT "B" - ASSUMED CONTRACTS**

## EXHIBIT "C" - FORM OF DEED

**RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:**

**AND MAIL TAX STATEMENTS TO**:

APN: _____

_____

DOCUMENTARY TRANSFER TAX $_____
__ Computed on the consideration or value of property conveyed;
OR
__ Computed on the consideration or value less liens or encumbrances
    remaining at time of sale.
                                        The tax has been determined by the undersigned grantor

### GRANT DEED

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
_____, a _____, does hereby GRANT to
_____, a _____ , all of that
certain real property in the City of _____, County of _____, State of
California, as more particularly described in Exhibit "A" attached hereto and made a part hereof.

IN WITNESS WHEREOF, Grantor has caused this instrument to be executed on this
_____ day of _____, 20__.

"GRANTOR"

a _____

By: _____
Name: _____
Title: _____

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                )

County of _____)


On _____ before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____ (Seal)

47

## EXHIBIT "D" - FORM OF BILL OF SALE

For good and valuable consideration, the receipt of which is hereby acknowledged, _____, a _____ ("Seller"), does hereby sell, transfer, and convey to _____, a _____ ("Buyer") any and all personal property owned by Seller, except for that certain personal property listed in the attached Schedule 1, and used exclusively in connection with the operation of that certain real property more particularly described in Exhibit "A" attached hereto (the "Personal Property"), as such Personal Property is more particularly described in the attached Schedule 2.

Seller has executed this Bill of Sale and **BARGAINED, SOLD, TRANSFERRED, CONVEYED** and **ASSIGNED** the Personal Property and Buyer has accepted this Bill of Sale and purchased the Personal Property **AS IS AND WHEREVER LOCATED, WITH ALL FAULTS AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE, EXPRESS, IMPLIED, OR STATUTORY, EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT OF SALE AND PURCHASE BETWEEN SELLER, _____ AND BUYER _____, DATED AS OF _____, 2020 (the "PURCHASE AGREEMENT").**

Dated this _____ day of _____, 2020.


**SELLER:**                                    _____


                                               By: _____
                                               Name: _____
                                               Title: _____

**BUYER:**                                     _____


                                               By: _____
                                               Name: _____
                                               Title: _____

49

**Exhibit "A" to Bill of Sale**

**Description of Land**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

> LOTS 1, 2, 3, 4, 37, 38, 39, 40 AND THE SOUTH 10 FEET OF LOT 36 OF TRACT 1624, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 21, PAGE(S) 58 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

> APN: 5503-014-020.

**Schedule 1 to Bill of Sale**

**Excluded Property**

**Schedule 2 to Bill of Sale**

**List of Personal Property**

## EXHIBIT "E" - FORM OF SELLER'S CLOSING CERTIFICATE

THIS SELLER CERTIFICATION (this "Certification") is made as of the ____ day of _____, 2020, by _____, a _____ ("Seller"), to _____, a _____ ("Buyer").

### R E C I T A L S:

A.      Pursuant to that certain Purchase and Sale Agreement dated as of _____, 2020 between Seller and Buyer or its respective predecessor-in-interest (together with all amendments and addenda thereto, the "Agreement"), Seller has agreed to sell to Buyer that certain three-story, 80,046 sq. ft. shopping center on approximately 1.67 acres located at 450 S. Western, Los Angeles, California, Assessor's Parcel Number 5503-014-020.

B.      The Agreement requires the delivery of this Certification.

NOW THEREFORE, pursuant to the Agreement, Seller does hereby represent and warrant to Buyer that:

1.      Except as specifically set forth below, each and all of the representations and warranties of Seller contained in the Agreement are true and correct as of the date hereof as if made on and as of the date hereof.

2.      This Certification is subject to the terms and conditions of the Agreement.

[Signatures on following page]

53

IN WITNESS WHEREOF, the undersigned has executed this Certification as of the day and year first above written.

**SELLER:**

[_____],
a [_____]


By:_____

Name:
Title:

54

## EXHIBIT "F" - FORM OF BUYER'S CLOSING CERTIFICATE

THIS BUYER CERTIFICATION (this "Certification") is made as of the ____ day of _____, 2020, by _____, a _____ ("Buyer"), to _____, a _____ ("Seller").

### R E C I T A L S:

A.      Pursuant to that certain Purchase and Sale Agreement dated as of _____, 2020 between Seller and Buyer or its respective predecessor-in-interest (together with all amendments and addenda thereto, the "Agreement"), Seller has agreed to sell to Buyer that certain three-story, 80,046 sq. ft. shopping center on approximately 1.67 acres located at 450 S. Western, Los Angeles, California, Assessor's Parcel Number 5503-014-020

B.      The Agreement requires the delivery of this Certification.

NOW THEREFORE, pursuant to the Agreement, Buyer does hereby represent and warrant to Seller that:

1.      Except as specifically set forth below, each and all of the representations and warranties of Buyer contained in the Agreement are true and correct as of the date hereof as if made on and as of the date hereof.

2.      This Certification is subject to the terms and conditions of the Agreement.

[Signatures on following page]

       IN WITNESS WHEREOF, the undersigned has executed this Certification as of the day and year first above written.

**BUYER:**

[_____],
a [_____]


By:_____

Name:
Title:

56

**EXHIBIT "G" – LEASES**

## EXHIBIT "H" – LITIGATION

1. *Admire Capital Lending LLC, et al. v. 450 S. Western, LLC*, Case No. BC664871

2. *Admire Capital Lending, LLC v. Hyun Soon Oh, et al.*, Case No. BC686225

3. *450 S. Western, LLC v. Admire Capital Lending, LLC, et al.*, Case Number 18STCV05636

4. *Square Mixx LA Inc. v. 450 S. Western*, Case No BC711005

5. *450 S. Western, LLC v. Wilshire Bank*, Case No. BC586990

6. *One Stop Financial Consulting, Inc., et al. v. 450 S. Western, LLC*, BC596025

7. *Eunice Y. Tak, et al. v. 450 S. Western, LLC*, Case No. 19STCV12979

8. *David Rhee, et al. v. Admire Capital Lending, LLC, et al.*, Case No. 19STCV32953

9. *Socal Lien Solutions, LLC, et al. v. Ani Construction, et al.*, Case No. 19SHLC39510

10. *Evergreen Capital Assets v. 450 S. Western, et al.*, Case No. 19STCV46153

11. *Brenda Elizabeth Gutierrez Bautista, et al. v. Beverly World Industries, Inc., dba California Market*, Case No. BC705775

12. *Partner Assessment Corp. v. 450 S. Western, LLC et al.*, Case No. 20STLC00680

13. *Sino-US v. 450 S. Western, LLC,* JAMS Reference No. 1220057487

**EXHIBIT "I" - SERVICE AGREEMENTS**

**EXHIBIT "J" - ENVIRONMENTAL REPORTS**

EXHIBIT "K"

ESTOPPEL CERTIFICATE

## EXHIBIT "K"

### FORM OF TENANT ESTOPPEL CERTIFICATE

Re:    Lease (as modified in the second paragraph below, the "**Lease**") dated _____ between _____ ("**Landlord**"), and _____ ("**Tenant**"), doing business as _____; Square Footage Leased: _____ square feet; Store Address: _____(the "**Premises**")

The undersigned Tenant under the Lease hereby certifies to _____ and its successors and assigns, to _____, prospective purchaser and its successors and assigns ("**Purchaser**") of that certain real property located at _____ (the "**Property**"), which includes the Premises, and to _____ such Purchaser's lender and its successors and assigns ("**Lender**"), the following:

There has not been a cancellation, modification, assignment, sublease, renewal, extension, or amendment to the Lease, except the following: _____.

All Rent (including without limitation, all base rent, additional rent and percentage rent, if any) currently due and payable by Tenant has been paid through _____. The amount of rent prepaid, if any, is $_____ and the security deposit made, if any, is $_____. Tenant acknowledges that the current monthly rental payable by Tenant to Landlord (exclusive of Percentage Rent) is as follows: (i) the monthly base rent: $_____ ; and (ii) the monthly pro-rata share common area maintenance costs, real property taxes and insurance costs: $_____. Tenant's pro rata share of all NNN Expenses is _____%. No monthly rent has been paid by Tenant to Landlord more than one (1) month in advance. The amount of past due Rent owed by Tenant to Landlord, as of the date of this Estoppel Certificate is: $_____.

Other than the Lease, there are no other agreements, written or oral, between Landlord and Tenant regarding the Premises or Tenant's obligation to pay rentals under the Lease, and Tenant does not claim a right to any concessions, free rent, or rental abatement other than as set forth in the Lease.

The Lease commenced on _____. The Lease terminates on_____, and Tenant is not entitled to any renewal options except _____ years. By the exercise of all such renewal options, Tenant may extend the Lease until _____.

The Lease is in full force and effect and Tenant does not have any presently existing claims against Landlord or any offsets against rent due under the Lease. There are no (i) defaults of Landlord under the Lease, (ii) existing circumstances which with the passage of time, or notice, or both, would give rise to a default under

the Lease, (iii) existing rights to abate, reduce or offset sums against rent or terminate this Lease because of any other condition, or (iv) existing circumstances which with the passage of time, or notice, or both, would give rise to a right to abate, reduce or offset sums against rent or terminate the Lease.  Tenant has no defense, claim or demand against Landlord.  Tenant acknowledges and agrees that the Lease is triple-net (NNN).

The Premises have been completed and accepted and are in conformity with the terms of the Lease, and Tenant is currently occupying the Premises.  Tenant has been paid all sums (if any) with respect to allowances for construction performed at the Premises by Tenant.

Tenant is not a debtor in any bankruptcy proceeding or other insolvency proceeding related to Tenant.

The Tenant has not received any option to purchase any portion of the Premises or the Property, or any option or right of first refusal relative to the Premises or additional space on the Property.

Tenant has no outstanding offsets or credits against, deductions from, or "free rent" period entitlements with respect to its future rent obligations.

Attached hereto is an accurate and complete copy of the Lease (and all amendments thereto, and any guarantees of the Lease).  The foregoing information is accurate and complete.

The undersigned represents and warrants that he or she has all requisite authority to execute this Estoppel Certificate on behalf of Tenant.  The undersigned acknowledges that Seller, Purchaser and Lender have requested the information contained herein for purposes of confirming and clarifying certain provisions of the Lease and is relying (and will rely) on the truth and accuracy of the representations made herein and upon the authority of the undersigned to execute this Estoppel Certificate on behalf of Tenant, in connection with Purchaser's decision to purchase (or not to purchase) the Property and Lender's decision to finance (or not finance) said purchase.  This statement shall be binding upon Tenant and Tenant's heirs, personal representatives, successors and assigns.

Date: _____

"TENANT"      _____

63

By:      _____

Name:      _____

Title:      _____

64

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Arent Fox LLP, Gas Company Tower, 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013.

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF FILING OF EXECUTED PURCHASE AND SALE AGREEMENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) **9/15/2020** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **9/15/2020**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**JUDGE**

United States Bankruptcy Court
Honorable Ernest M. Robles
255 E. Temple Street, Suite 1560
Los Angeles, CA 90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/15/2020 | AYLIN SOOKASSIANS | */s/ Aylin Sookassians* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

AFDOCS/21859689.1

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

Jesse S Finlayson on behalf of Creditor Philmont Management, Inc.
jfinlayson@ftrlfirm.com, bmendoza@ftrlfirm.com

M Douglas Flahaut on behalf of Debtor 450 S. Western, LLC, a California limited liability company
flahaut.douglas@arentfox.com

Maria L Garcia on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF 450 S. WESTERN, LLC
Maria.L.Garcia@lewisbrisbois.com

Jeffrey T Gwynn on behalf of Creditor New Creation Engineering and Builders, Inc.
jgwynn@vervelaw.com

Mark S Horoupian on behalf of Interested Party Courtesy NEF
mhoroupian@sulmeyerlaw.com, mhoroupian@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com

Christian T Kim on behalf of Interested Party Christian Kim
ckim@dumas-law.com, ckim@ecf.inforuptcy.com

Richard J Laski (TR)
rlaski@wilshirellc.com

John P Lee on behalf of Creditor One Stop Financial Consulting, Inc.
jlee@kspllaw.com, admin@kspllaw.com

John P Lee on behalf of Creditor Richvest Asset Holdings, LLC.
jlee@kspllaw.com, admin@kspllaw.com

Won Lee on behalf of Attorney Square Mixx LA, Inc.
dlee@metallawgroup.com

Won Lee on behalf of Attorney Eunice Y. Tak
dlee@metallawgroup.com

Kenderton S Lynch on behalf of Creditor Evergreen Capital Assets, LP
kenlynchlaw@aol.com

Kenderton S Lynch on behalf of Interested Party Courtesy NEF
kenlynchlaw@aol.com

David W. Meadows on behalf of Creditor G 450 LLC
david@davidwmeadowslaw.com

David W. Meadows on behalf of Creditor G 450, LLC, Pontis Capital, LLC, and Five West Capital, LP
david@davidwmeadowslaw.com

David W. Meadows on behalf of Interested Party Courtesy NEF
david@davidwmeadowslaw.com

Juliet Y Oh on behalf of Interested Party Admire Capital Lending, LLC
jyo@lnbrb.com, jyo@lnbrb.com

Juliet Y Oh on behalf of Interested Party Belmont Two Investment Holdings, LLC
jyo@lnbrb.com, jyo@lnbrb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

AFDOCS/21859689.1

Juliet Y Oh on behalf of Interested Party Courtesy NEF
jyo@lnbrb.com, jyo@lnbrb.com

Aram Ordubegian on behalf of Debtor 450 S. Western, LLC, a California limited liability company
ordubegian.aram@arentfox.com

Sagar Parikh on behalf of Creditor SoCal Lien Solutions, LLC
SP@BeverlyHillsLawCorp.com

Amelia Puertas-Samara on behalf of Debtor 450 S. Western, LLC, a California limited liability company
itcdbgc@edd.ca.gov, itcdgc@edd.ca.gov

Dean G Rallis, Jr on behalf of Interested Party Courtesy NEF
drallis@hahnlawyers.com,
marias@hahnlawyers.com;mpham@hahnlawyers.com;drallis@ecf.courtdrive.com;drallis@ecf.inforuptcy.com

Victor A Sahn on behalf of Interested Party Courtesy NEF
vsahn@sulmeyerlaw.com,
pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com

Lovee D Sarenas on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF 450 S. WESTERN, LLC
lovee.sarenas@lewisbrisbois.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Christopher K.S. Wong on behalf of Debtor 450 S. Western, LLC, a California limited liability company
christopher.wong@arentfox.com, yvonne.li@arentfox.com

Felix T Woo on behalf of Creditor SINO-US INVESTMENT AND MANAGEMENT CONSULTANT LIMITED
fwoo@ftwlawgroup.com, admin@ftwlawgroup.com

Hatty K Yip on behalf of U.S. Trustee United States Trustee (LA)
hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

Timothy J Yoo on behalf of Interested Party Courtesy NEF
tjy@lnbyb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    **F 9013-3.1.PROOF.SERVICE**

AFDOCS/21859689.1